UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,              CRIMINAL NO. 16-CR-20291

vs.

                                      HON. NANCY G. EDMUNDS

ISAAC JAMES HARGROVE,

                    Defendant.

_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release and
Recommendation for Home Confinement**

Between March 18, 2016, and April 5, 2016, an ATF confidential informant made nine controlled buys of crack cocaine from Defendant Isaac James Hargrove. The amount involved in the sales was 53 grams of cocaine base (PSR, ¶ 10). Hargrove was subsequently arrested and his residence was searched. During the search two firearms, heroin, crack cocaine and narcotics packaging materials were found (PSR, ¶ 11).  Hargrove pleaded guilty to possession with intent to distribute crack cocaine and possession with intent to distribute heroin, in violation of 21 U.S.C. §841(a)(1) (R.16: Plea Agreement).

1

Hargrove has a lengthy prior criminal history of drug trafficking and his sentence was enhanced as a career offender (PSR, ¶ 24). He was sentenced on April 18, 2017 to 72 months' imprisonment on each count, to run consecutively, for a total sentence of 144 months, to be followed by a 4 year period of supervised release (R. 27: Judgment).

Hargrove began serving his current sentence on September 6, 2017. He has served approximately 35% of his sentence. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Hargrove does not satisfy the substantive requirements for compassionate release.] "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

Hargrove is not otherwise eligible for release. Hargrove's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). Hargrove is a drug trafficker who has a lengthy history of criminal activity involving drugs and firearms. He has at least six prior felony convictions for drug trafficking and numerous prior arrests for felonious assault (PSR, ¶ 41-47). At the time of his arrest in this case he was on parole for a state felony drug case.

And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release. Hargrove's conduct in this case,

2

selling cocaine base to an ATF confidential informant and the items recovered during a search of his residence, is serious criminal behavior. His prior criminal history, which includes numerous convictions for drug trafficking, qualifies him as a career offender pursuant to USSG §4B1.1. Prior to his arrest Hargrove had no verifiable employment, a history of probation and parole violations and a history of substance abuse.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Hargrove, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of July 23, 2020, this process has already resulted in at least 7042 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 2020 WL 3056217, at *11—the Court should deny Hargrove's motion for compassionate release.

## Background

At age 46, Hargrove has an extensive criminal history involving illegal drugs. Hargrove obtained his first conviction for drug possession at age 17. He received a sentence of 5 years' probation (PSR, ¶28). Just two months later, he was convicted of breaking and entering an occupied dwelling with intent. Again, he received a sentence of 5 years' probation (PSR, ¶29). In 1992, at age 19, he was convicted of possession with intent to deliver narcotics (crack cocaine) and was sentenced to 5-20 years' custody (PSR, ¶30). Hargrove was in possession of a firearm during that offense. He violated his parole in that case by engaging in new criminal conduct. In 1999, Hargrove was convicted of delivery/manufacture of cocaine and received a sentence of 1-10 years (PSR, ¶31). In 2007, at age 33, Hargrove was again convicted of delivery/manufacture of a controlled substance. He received a two year term of probation which he violated (PSR, ¶32). Shortly after that, in 2008, Hargrove was again convicted of delivery/manufacture of a controlled substance. He was sentenced to a term of imprisonment of 6 months, 2 years' probation. He violated the terms of his probation by engaging in new criminal activity and his probation was continued (PSR, ¶33) In May 2009, Hargrove was convicted of deliver/manufacture of controlled substance and received a sentence of 6 months' custody (PSR, ¶34). In January 2013, Hargrove was convicted of delivery/manufacture of crack cocaine and was sentenced to 2 -5 years' custody. He

violated his parole by engaging in new criminal conduct, the drug sales which resulted in his arrest in this case (PSR, ¶ 35).

Hargrove was arrested in this case on April 12, 2016, following nine controlled sales of crack cocaine to a confidential informant at a Detroit Coney Island restaurant. The purchases amounted to 53 grams of crack cocaine (PSR, ¶ 10). On the same date, a search warrant was executed at his house. Officers discovered the following items: one (1) Glock, Model 30, .45 Caliber, Semi-Automatic Firearm, Serial Number RWR661; one (1) Heckler and Koch, Model P30, 9mm, Semi-Automatic Firearm, Serial Number 129-042988; four (4) large sandwich bags of crack cocaine (191 grams); one (1) sandwich bag of heroin (8.75 grams); and miscellaneous narcotic packaging equipment (PSR, ¶ 11). Hargrove was charged with possession with intent to distribute heroin and cocaine base, possession of a stolen firearm, felon in possession of a firearm and possession of a firearm in furtherance of drug trafficking ( R. 10: Indictment). He pleaded guilty to possession with intent to distribute heroin and cocaine base. His sentence was subject to a 60 month mandatory minimum based upon the amount of crack cocaine distributed. (R.16: Plea Agreement). Hargrove's sentence was enhanced as a career offender under §4B1.1(b)(2) (PSR, § 24).  Hargrove was sentenced on April 18, 2017 to 72 months' imprisonment on each count, to run consecutively, for a total sentence of

144 months, to be followed by a 4 year period of supervised release (R. 27: Judgment).

Hargrove began serving his prison sentence on September 6, 2017, and is currently incarcerated at FCI Hazelton. He is 46 years old, and his projected release date is August 13, 2026. His primary underlying medical conditions are ascending aortic aneurysm, obesity and hypertension (Exhibit 1). Nevertheless, Hargrove has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic.

Hargrove sought release from the BOP on May 20, 2020 and his request was denied on June 10, 2020.

## Argument

### I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone

allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

Hargrove is currently at FCI Hazelton, located in Bruceton Mills, West Virginia. The FCI facility houses 1198 inmates. At this time there has been only one inmate who has tested positive for Covid-19 and one staff member with a positive test. One staff member has recovered. There have been no reported deaths, *See* https://www.bop.gov/coronavirus/.  In Preston county, where the FCI is located, there have been 113 confirmed cases and 2 deaths.

### B.     The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The

Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7042 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

    1.) Each inmate's age and vulnerability to Covid-19;

    2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would

10

be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s

a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

> ### C. The Court should decline Hargrove's request for a recommendation that he be granted home confinement.

The Court should also deny Hargrove's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement (R. 32: Def's Motion, PgID 579). Even assuming the Court has the authority to grant such a recommendation, Hargrove is not a strong candidate for it. Hargrove has only served 4 years and 3 months of his 144 month sentence. His projected release date is August 13, 2026. He has engaged in misconduct while in prison, including possession of drugs/alcohol and refusing to obey orders (Exhibit 2-Dicipline). The BOP has determined that he is a medium risk recidivism level (Exhibit 3-Pattern Score). Hargrove has suggested that he could reside with his sister, Ellen Turner, who at the time of his arrest was unemployed and living on social security disability benefits as a result of sickle cell anemia (PSR, ¶ 49). Hargrove has also suggested residence with another sister, Velma Jackson, who is 18 years younger than Hargrove, and whose employment and living situation are unknown (PSR, ¶ 49).

At the time of his arrest, Hargrove had no verifiable work history (PSR, ¶ 59). While in prison he has not enrolled in vocational training programs and has not earned his GED. In addition, he has not established any financial savings for release

12

needs (Exhibit 4 - Program Review Report). Hargrove's record thus suggests that his release into home confinement at this time would quickly spiral into additional criminal conduct.

## II.    The Court should deny Hargrove's motion for compassionate release.

Hargrove's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit

recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

14

### A. Hargrove is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892,

at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Hargrove and other inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Hargrove's medical records confirm that he has an ascending aortic aneurysm, obesity and hypertension, which the CDC has identified as risk factors for Covid-19. Given the heightened risk that Covid-19 poses to someone with those medical

conditions, Hargrove has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Hargrove remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators

17

have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Hargrove's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Hargrove has an extensive history of felony drug convictions, arrests for violent assaultive offenses and a history of possessing firearms in connection with his drug offenses. He also has a history of parole/probation violations and prison misconduct.  The instant offense was committed while on parole for a state felony drug conviction (PSR, ¶ 37). The BOP has determined that he should not be granted a compassionate release.  His release at this time would endanger public safety.

### C.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15,

2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Hargrove eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Hargrove is a multi-convicted drug dealer with a history of possessing firearms and engaging in violent behavior (PSR, ¶ 41-47). In this case he was convicted after engaging in multiple sales of crack cocaine to a federal confidential informant. At the time of his arrest he was on parole for a state drug felony conviction. Hargrove has not yet earned a GED and has no vocational training. Due to his prior periods of incarceration, he has no verifiable employment experience. According to the BOP, he has no financial savings for release (Exhibit 4-Program Review Report). He has a history of substance abuse, and his dealings with drugs/alcohol appears to have continued, despite his imprisonment (Exhibit 2-Discipline). Prior terms of state incarceration have not deterred him from criminal activity. Because he has only served a small portion of his federal criminal sentence, the deterrence effect of his sentence in this case is uncertain. Hargrove has not yet prepared himself for re-entry

into society by solidifying a plan for his release including completing vocational training, obtaining a GED, gaining employment experience or saving financial resources.

Further, the BOP medical records confirm that Hargrove's medical conditions are being monitored and controlled with medications. Hargrove's aortic aneurysm is being regularly monitored for any enlargement. Blood pressure medications are being used to control the aneurysm and his hypertension. Options for elective surgery, specifically a Bentall procedure, which is a surgery to replace part of the aorta and the aortic valve of the heart because of a bulge (aneurysm) in the aorta, have been discussed with Hargrove. According to his recent BOP medical records, he is currently awaiting follow up tests to determine if the aneurysm has grown to the level in which surgery is recommended by the cardiac physicians (Exhibit 1). Hargrove's last EKG was on March 11, 2020. His most recent medical appointment was for optometry on June 25, 2020.

Compassionate release is inappropriate.

## III.   If the Court were to grant Hargrove's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Hargrove's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

**Conclusion**

Hargrove's motion for compassionate release/sentence reduction should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
*United States Attorney*

s/Susan E. Fairchild  (P41908)
Assistant United States Attorney
211 West Fort St. Suite 2001
Detroit, Michigan 48226
(313) 226-9577
Susan.Fairchild@usdoj.gov

Dated: July 23, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2020 I electronically filed the foregoing document with the Clerk of the Court using the ECF system and have mailed a copy to the following:

Isaac James Hargrove
FCI Hazelton
Federal Correctional Institution
P.O. BOX 5000
BRUCETON MILLS, WV 26525

Colleen Fitzharris
Attorney for Defendant Hargrove
Office of the Federal Community Defender

21

s/*Susan E. Fairchild*
SUSAN E. FAIRCHILD
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9577
Susan.Fairchild@usdoj.gov